# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PATRICIA A. ANDWAN,                                    Case No. 1:13-cv-624
        Plaintiff,

                                             Barrett, J.
                                             Bowman, M.J.

     v.


VILLAGE OF GREENHILLS, et al.,

        Defendants.


## REPORT AND RECOMMENDATION

On September 9, 2013, initially proceeding through counsel, Plaintiff Patricia Andwan paid the requisite filing fee and filed this civil rights suit against the Village of Greenhills and related individual defendants. Because Plaintiff now proceeds *pro se*,[1] the case has been referred to the undersigned magistrate judge for all pretrial proceedings, including for a Report and Recommendation ("R&R") on any dispositive motions. Currently pending are two separate motions for summary judgment filed by three remaining Defendants. For the reasons that follow, the undersigned recommends that those motions be GRANTED.

## I.    Background

Plaintiff Patricia Andwan is a resident of the Village of Greenhills (the Village), located in Hamilton County, Ohio. The Village employs its own police force, including Defendant Police Officer Andrew D. Moore. Officer Moore began employment with the

---

[1]Plaintiff proceeded *pro se* for a period of time after her first attorneys withdrew, but subsequently retained new counsel. Plaintiff's second retained counsel filed a second amended complaint on her behalf on January 26, 2015. Plaintiff later fired that attorney, but the Court denied her subsequent attempts to further amend her complaint or to appoint new counsel on her behalf. Thus, Plaintiff has continued to proceed *pro se* on her second amended complaint since May 7, 2015. (Doc. 121).

Village on July 11, 2007, and began working as a full-time patrol officer on August 11, 2008. Defendant Gregory Lester is a civilian contractor for the Village, who in 2011 was engaged in tree-cutting operations for the Village.[2]

Plaintiff's second amended complaint details a long history of acrimony between Ms. Andwan, Village officials, and its police force. She alleges that she is a former Village employee who last worked as a property manager for the Village in 2007,[3] and who has run for various political offices since 2007.[4] While Plaintiff maintains that the detailed history of her adverse relationship with the Village, its administration, and/or its police force is relevant to demonstrate the Defendants' motivation,[5] the claims in her

---

[2]An earlier rendition of Plaintiff's complaint (Doc. 26) identified the Defendant as "Gregory F. Lester, d/b/a Gregory Forrest Lester, Inc." Although the remaining second amended complaint identifies the Defendant only individually as a "civilian contractor…who was engaged in tree cutting operations," (Doc. 103 at ¶3), Plaintiff testified to her understanding that the second amended complaint was intended to plead a cause of action against both Mr. Lester and his company. (Andwan Deposition, Volume I, Doc. 208 at 28-30). Therefore, Defendant's motion for summary judgment seeks judgment on behalf of both Gregory F. Lester individually and "d/b/a Gregory Forrest Lester, Inc." (Doc. 199).

[3]Plaintiff testified in her deposition that whether she was an actual employee of the Village has "been quibbled about" and is "questionable." (Doc. 208 at 18-19).

[4]Plaintiff's original complaint alleged that in September 2007, she filed candidacy papers allowing her to run as a write-in candidate for Village Council. (Doc. 1 at ¶ 7). In April 2009, she filed papers to run for mayor of the Village. (Doc 1 at ¶ 20). On April 28, 2011, she filed again to run for Village Council. (Doc. 1 at ¶ 26). The instant lawsuit is apparently the second civil lawsuit filed by Plaintiff against Village officials. In March 2010, she filed a civil rights action against the Village and several officials, claiming that they violated her First Amendment rights by bringing a criminal prosecution that was later dismissed. In her initial complaint, Plaintiff alleged that the case settled in June 2010, with the Village paying Plaintiff a sum of money for damages and attorney's fees. (Doc. 1 at ¶24; see also Doc. 1-13).

[5]Plaintiff has attached a number of exhibits to her memorandum in opposition to the pending motions for summary judgment that bear witness to her long-running disputes. Exhibit J purports to be a letter dated 9/18/08 that reflects the Village engaged an attorney to serve as special counsel in order to "advise the Village in connection with a harassment investigation" regarding Plaintiff, based upon her conduct at that time. The same exhibit was attached to Plaintiff's original complaint. (See Doc. 1-10). Exhibit I, dated 9/5/08, purports to be a letter from another law firm to the Hamilton County Prosecutor's Office, expressing the view that Plaintiff's behavior "could be defined as Telecommunications Harassment" based upon the appearance that the volume of email was sent "to harass the recipients," and/or that her behavior could potentially be in violation of "Obstructing Official Business." Exhibit H reflects a memorandum dated 4/3/09, purportedly from the Village Municipal Manager to "All Village Staff and Volunteers" re "Policy Pertaining to Pat Andwan Communications." The policy references interactions between Plaintiff and members of Village Council, the Board of Zoning Appeals, the Planning Commission, and staff, and requests that all communications be forwarded to Ms. Berry and the Village Law Director, without providing a substantive response other than a request that Plaintiff not send further email to that staff member. The policy recommends that Village staff members "refrain from engaging in Village-related oral communications" and "exercise caution when communicating orally with" Plaintiff.

second amended complaint are limited to the events of November 2, 2011, when Plaintiff was observed by Defendant Lester photographing tree removal operations near her residence.

The most relevant event prior to November 2, 2011 was a related incident that occurred on or about September 1, 2011. (Doc. 103 at ¶13). During that event, Lester and his crew were directed by the Village to trim a dead tree, in response to a request made by Plaintiff herself to the Village. (Andwan Deposition, Volume I, Doc. 208 at 54). Though physically located in an adjacent yard, the tree partly encroached upon the townhouse property in which Plaintiff resides. Plaintiff testified that was the first time that she recognized Lester or his company, since, prior to that date, there were multiple "tree trimmers all over the place from time to time." (Doc. 208 at 42). She went outside to observe the tree-cutting from the back of her property. During the operations, debris fell onto her property. Lester called Village police to complain about Plaintiff's proximity, and Defendant Moore responded. Moore asked Plaintiff to return to the inside of her home based upon safety concerns. Taking pictures of Moore, Plaintiff refused. Moore issued her a warning and left. Plaintiff later asked Lester and his crew to clean up the debris on her property, which they did. (Doc. 208 at 61).

On November 2, 2011, Lester and his crew returned to the street on which Plaintiff resides, albeit at a further distance down the street from Plaintiff's home. Plaintiff again watched the crew from a nearby yard (not her own), and during a lull in the tree-trimming activity, walked over to the job site and took photographs of the tree trunk. Observing Plaintiff taking photos in close proximity to the job site, Defendant Lester again contacted Village police, and Defendant Officer Moore arrived around 9:50

a.m. Moore instructed Plaintiff to leave the area based on safety concerns, and threatened to arrest her if she did not comply.[6] Plaintiff alleges that he briefly "shoved" her by placing his hands on her chest, but that she did not fall and was not injured from that initial fleeting contact. (Andwan Dep., Vol. III, Doc. 210 at 388). As soon as he touched her, she began screaming at the top of her lungs "Get your hands off of me." (Andwan Dep., Vol. II, Doc. 209 at 269, 288).

Plaintiff alleges that after Moore placed his hands on her, she decided to walk away and either told Moore "I'm leaving" or "I'm going back here," or "you know…just made it apparent that when I turned I was going to go back between that area." (*Id.* at 288-289). Turning her back to Moore, she took no more than one or two steps when in response, Moore seized her by placing his hands on the top of her shoulders from behind,[7] causing her to stop. Because she was walking forward at the time, she alleges the abrupt stop momentarily lifted her off the ground, for a half second. (Doc. 210 at 389-392). She testified that as she was being lifted, Moore's grip on the top of her left shoulder/coat came loose and she heard a "rip" from her shoulder and felt "excruciating pain," ending up kneeling on the ground. (*Id.* at 390, 392). She testified that she suffered an injury to her shoulder in that moment. (*Id.* at 394). While she "sagged down" after Moore lost his grip on her left shoulder, Moore grabbed her left arm or wrist and twisted it up behind her back in order to handcuff her. (*Id.* at 393, 395). He told her she was under arrest as he did so. The entire sequence of the arrest (from seizure to

---

[6]Plaintiff testified that she could not hear the officer's words when he first appeared due to the noise of the tree equipment. (Doc. 209 at 267-268). She testified that all she heard him say was "you have to move or I'm going to arrest you." (*Id.* at 268). However, Plaintiff's testimony clearly implies understanding that Moore was directing her to move for her own safety, as she also testified that when she initially refused to move, she told him "I'm not in any danger here." (*Id.*)
[7]Plaintiff unequivocally testified that Moore did not grab under or around her arms or body, but stopped her by grabbing only the top of her shoulders and/or the top fabric of her coat.

trying to cuff her) was one continuous motion by Moore, and did not take more than one or two seconds. (*Id.* at 395-396). Plaintiff continued screaming throughout. (*Id.* at 395).

As Plaintiff resisted the application of the second handcuff by Moore, he "shoved" her towards his adjacent patrol car and "pinned" her face down, while she continued to struggle.[8] He did not complete the action of cuffing Plaintiff but instead simply held her in place while he called on his radio for backup. While he awaited the arrival of backup, he did not lean in against her as he did initially when placing her against his vehicle, but loosened his grip. (Doc. 210 at 401). Numerous police responded within 2-3 minutes, and a second officer assisted Moore in cuffing Plaintiff's still-free hand.

Plaintiff alleges that, after she was cuffed, Moore "shoved" her in the back of his squad car. She complains that it "certainly wouldn't have been what a chauffeur would have done to escort someone carefully and to assist an elderly to get into a car," but she does not claim any additional injury other than continued pain from the shoulder injury experienced within the first two seconds of her arrest. (Doc. 210 at 404-405). Nevertheless, she testified that because Moore failed to secure her with a seatbelt, she fell over and experienced further pain to her injured shoulder, because she slid around as he drove her to the station. (Doc. 210 at 401-402). Plaintiff testified that after her initial injury, her shoulder and arm were "aching" in the police car "but it wasn't this excruciating, sharp, intensity…." (*Id.* at 398-399). In response to Defendants' motions for summary judgment, she included a form that purports to be Officer Moore's "Booking

---

[8]Plaintiff testified that she was struggling only because she was holding her glasses and needed to put them away. (Doc. 210 at 401). However, she also testified that she was holding her camera at the time and was able to take a picture of her arrest with her right hand during the time period when Officer Moore had her left arm behind her back and cuffed. (Doc. 209 at 348). Somewhat inconsistently, Plaintiff testified that in the moment prior to her arrest, she was walking away and "wasn't carrying anything in my hands." (Doc. 210 at 394). The reason that Plaintiff was resisting being cuffed is not material to determine whether Defendant Moore violated Fourth Amendment standards.

Officer Questions" on the date of her arrest, including his notation of "arm and wrist aching" to the question "Does Subject Have Any Health Problems, Illnesses, Injuries, or Mental Disorders?" (Doc. 213-1 at 5, Plaintiff's Exhibit C).

Although her current complaint alleges she suffered bruises, "loss of wrist and arm movement, a torn rotator cuff and loss of muscle turning range in her neck…which requires surgery to resolve," she conceded that she did not experienced any bruising, and she has produced no evidence of a rotator cuff tear, loss of muscle turning range, or surgical recommendation that would either document the 2011 shoulder injury or link any subsequent record of injury to the November 2, 2011 incident. (Doc. 209 at 359). The only reference to surgery in Plaintiff's deposition testimony was that, during a visit with friends over the 2011 Christmas holiday, her friends theorized that she might have a rotator cuff injury that could require surgery, and suggested that she see a doctor. (*Id.* at 355-356). Plaintiff alleges additional damages attributable to "emotional trauma including an anxiety disorder" based upon "the Defendants['] previous law enforcement harassment and the excessive force incident." (Doc. 103 at ¶21).

Plaintiff was transported to the Hamilton County Justice Center, where she was released at approximately 5 or 6 pm the same day. (Doc. 208 at 195). Justice Center records do not indicate any complaints of pain on her intake form. She did not seek medical treatment for her alleged shoulder injury in the weeks following her release.

Plaintiff was initially charged with disorderly conduct and resisting arrest, but the charge of resisting arrest was later dismissed.[9] Plaintiff was subsequently prosecuted for disorderly conduct, but her prosecutions terminated with acquittals on May 23, 2012

_____

[9]The record before the undersigned is not clear, but Plaintiff testified that the dismissal of the resisting arrest charge occurred after an in-chambers meeting between the prosecutor, her appointed defense counsel, and the state court judge. (Doc. 209 at 318-319).

and on September 19, 2012, respectively.

In her second amended complaint, Plaintiff articulates three claims against Moore (in both his official and individual capacities) and the Village (jointly referred to herein as "the Village Defendants"). In her first two claims, she alleges that both are liable for Moore's use of excessive force in violation of the Fourth Amendment of the U.S. Constitution, and for the deprivation of her right to be free of unreasonable search and seizure under the Fourth Amendment. Her complaint also alleges assault and battery in violation of state law. (Doc. 103, Counts One and Two).

Plaintiff further alleges that the Village "ratified" Moore's conduct and "as a matter of business policy or deliberate indifference" did not properly train Moore, or alternatively, has an "official business policy of not supervising Moore." (Doc. 103 at ¶26). Plaintiff alleges that the Village and Moore "were…motivated by a malicious intent to physically retaliate against the Plaintiff" based upon her prior First Amendment activity, which was critical of the Village and its police force. (*Id.* at ¶27). In a separately stated third claim against Moore and the Village, Plaintiff alleges that the Defendants inflicted "emotional distress requiring medical treatment" upon Plaintiff by "tormenting and mistreating her at public meetings…during and after [the] excessive force arrest…." (Count Three).

"Count Four" of Plaintiff's second amended complaint contains allegations and two additional state law claims against Defendant Lester, pleaded in the alternative. Plaintiff alleges generally that Lester has "engaged in a pattern and practice of making false and petty police reports about the Plaintiff allegedly interfering with his government financed tree cutting business…." (Doc. 103 at ¶37). On November 2, 2011 in

particular, she alleges that Lester called police to falsely report that Plaintiff was interfering with his tree cutting operations, leading to Plaintiff's subsequent arrest. She alleges that Lester "did not have a good faith basis to accuse the Plaintiff of any crime and was motivated by a malicious intent to retaliate and find a way to get the Plaintiff arrested and punished given the Plaintiff had made numerous complaints about his business operations to Village council on prior dates." (*Id.* at ¶40). She alleges that Lester intimidated one of his employees "to swear out a false police report," which led to her "malicious prosecution." (*Id.*) Plaintiff further claims that Lester "has committed an abuse of process" because his complaint, even if supported by probable cause, was made "with an ulterior motive to pervert…the justice system …to use a petty criminal law complaint to protect a publicly financed business from criticism by a tax payer…." (Count Four, Doc. 103 at ¶42).

On March 11, 2015, the two Village Defendants moved for partial judgment on Plaintiff's state law assault and battery claim, as barred by the statute of limitations, and on grounds that Plaintiff's intentional infliction of emotional distress claim could not be stated against the Village as a governmental entity. (Doc. 110). This Court granted that motion. (Doc. 114). Therefore, only Plaintiff's §1983 claims against the Village and Officer Moore remain, along with Plaintiff's intentional infliction of emotional distress claim against Officer Moore alone,[10] and her two state law claims against Defendant Lester.

The Village Defendants and Defendant Lester have filed separate motions for

---

[10]Plaintiff refuses to concede the validity of the second amended complaint, which she maintains was negligently filed by her former counsel, and has continually sought to reinstate an earlier amended version of her complaint that she filed *pro se.* For the reasons originally stated in the undersigned's Memorandum Order of April 7, 2016, and reiterated in several orders thereafter, Plaintiff's formal and informal motions to reinstate the prior complaint have been denied. (*See* Doc. 157).

summary judgment on all remaining claims. (Docs. 199, 200). Plaintiff failed to file a fully responsive memorandum in opposition, despite this Court's repeated warnings to Plaintiff that she was required to do so. However, on June 9, 2017, Plaintiff filed a "*pro se* objection to Magistrate [Judge] Bowman's Order (Doc. 205)…and Stopgap Response Brief" which has been fully considered by the undersigned, including the 138 pages of exhibits attached by Plaintiff to her "stopgap" response. (Doc. 213). Defendants object to the consideration of those exhibits on grounds that – other than the Defendants' discovery responses - the exhibits have not been authenticated, and many contain Plaintiff's handwritten notes.

Rule 56(c) requires parties to cite to particular materials in the record to support any fact. "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Rule 56(c)(2). The undersigned recognizes as well-founded Defendants' objections that none of Plaintiff's exhibits are properly authenticated and that they are inadmissible in their present form. However, the undersigned also recognizes that the Defendants do not contend that any of the exhibits have been falsified. To that extent, the undersigned believes that the exhibits that have been considered <u>could</u> be properly authenticated, and could be presented in an admissible form notwithstanding their current inadmissible form.[11] The undersigned also has reviewed and considered Plaintiff's deposition testimony as a whole. *See* Rule 56(c)(3)(permitting a court to consider not only cited materials, but all materials in the record).

In addition to her "stopgap" response, Plaintiff has filed a motion seeking another

---

[11]While all exhibits have been considered, the undersigned has declined to consider Plaintiff's handwritten notes on the exhibits.

"discovery status hearing," this time with presiding District Judge Michael R. Barrett. That motion has been denied by separate Order filed herewith.

## II.    Analysis

### A.  Standard of Review

In a motion for summary judgment, a court must view "the facts and any inferences that can be drawn from those facts - in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir.2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment - rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

The requirement that facts be construed in the light most favorable to the Plaintiff, however, does not mean that the court must find a factual dispute where record evidence contradicts Plaintiff's wholly unsupported allegations. After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)). In order to defeat a motion for

summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52. Although reasonable inferences must be drawn in favor of the opposing party, *see Matsushita*, 475 U.S. at 587, inferences are not to be drawn out of thin air. To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*, 475 U.S. at 586-587 (citation omitted).

The undersigned begins with the analysis of Defendant Lester's motion for summary judgment on the two state law claims filed against him, before turning to the motion filed by the Village Defendants.

**B.  Defendant Lester's Motion for Summary Judgment**

**1.  Malicious Prosecution Claim**

Defendant Lester argues first that Plaintiff's malicious prosecution claim is barred by Ohio's one-year statute of limitations. Under Ohio Revised Code § 2305.11, a malicious prosecution claim must be brought "within one year after the cause of action accrued." Here, Plaintiff's claim accrued when she won acquittal on the underlying disorderly conduct charges, on May 23, 2012 and on September 19, 2012. However, Plaintiff did not identify Lester (or his business) as a Defendant until she filed her first amended complaint on October 27, 2014, more than two years after any malicious prosecution claim arose. Therefore, her malicious prosecution claim is time-barred.

In her response in opposition to Defendant Lester's motion, Plaintiff argues that because her initial complaint through counsel was filed on September 9, 2013 (within one year of the 9/19/12 acquittal), her amended complaint should "relate back to that date." (Doc. 213 at 4). Whether new claims asserted against newly identified defendants "relate back" to the date that the original complaint was filed is governed by Rule 15(c), Fed. R. Civ. P. As a matter of law under Rule 15(c), and for the reasons stated in Defendant Lester's reply memorandum, Plaintiff's claims against Lester clearly do not relate back to her original complaint.

The original complaint named only the Village of Greenhills, Thomas Doyle, Andrew Moore, Robert Dean and Anne Ward as Defendants. (Doc. 1). The vast majority of that complaint related to conduct by the Village and its officials dating from 2007-2012. The only reference to the events of November 2, 2011 referred to a "private contractor engaged by Defendant Village" without otherwise identifying the contractor as Lester. (Doc. 1 at ¶32). Although the complaint included a malicious prosecution claim against Defendant Moore based upon the November 2, 2011 incident, no reasonable person would have construed the allegations as alleging a claim against the unidentified "private contractor." And, while Plaintiff's original complaint also contained two "abuse of process" claims, those claims also were clearly directed to the "ongoing conflict with numerous officials of Defendant Village for many years prior to the above-described events of May and June, 2011 and of November, 2011." (Doc. 1 at ¶55).

Plaintiff was aware of the alleged conduct of Lester at the time of the criminal hearings. (Doc. 213 at 5, citing the "conflicting stories" of Lester during her 2012 criminal trials). Therefore, she clearly was aware of all facts necessary to make out her

claims by not later than September 19, 2012.    Defendant Lester did not receive notice

of the original complaint, was not named in the original complaint, and was not even

identified by name.    Based upon the pleadings, the undersigned finds no basis to

"relate back" to September 9, 2013, Plaintiff's newly asserted *pro se* claims against

Defendant Lester in the October 27, 2014 version of her amended complaint.  *See In re*

*Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1449 (6th Cir. 1991) ("[T]he

precedent of this circuit clearly holds that 'an amendment which adds a new party

creates a new cause of action and there is no relation back to the original filing for

purposes of limitations.'" (internal citation omitted)); *accord, Lester v. Wow Car Co.,*

*Ltd.*, 675 Fed. Appx. 588, 592-593 (6th Cir. 2017).

### 2.  Abuse of Process

Unlike Plaintiff's time-barred malicious prosecution claim, her abuse of process

claim is governed by a longer statute of limitations, and is not time-barred.[12]  The tort of

malicious prosecution provides a remedy when a proceeding is instituted without

probable cause.  By contrast, the separate tort of abuse of process is available "when

process is used to accomplish an improper ulterior purpose," even though probable

cause exists.  *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 626 N.E.2d at 118, 68

Ohio St.3d at 298.  "Abuse of process does not lie for the wrongful bringing of an action,

but [only] for the improper use, or 'abuse,' of process."  *Kremer v. Cox*, 114 Ohio App.3d

---

[12]In *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 626 N.E.2d 115, 118, 68 Ohio St.3d 294, 298 (Ohio 1994), the Ohio Supreme Court first recognized the tort of abuse of process and determined that a four-year statute of limitations generally applies to such a claim.  However, in *Read v. Fairview Park*, 146 Ohio App.3d 15, 18, 764 N.E.2d 1079, 1081 (Ohio Ct. App. 2001), the court held that, unlike a malicious prosecution claim that accrues at the conclusion of a criminal proceeding, an abuse-of-process claim accrues on the date of the allegedly tortious conduct.  In addition, the *Read* court held that the statute of limitations for abuse-of-process claims against political subdivisions and their employees is two years, rather than the general four-year statute applicable to the same tort claim filed against non-governmental defendants. *Accord, Davis v. Clark County Bd. Of Com'rs*, 994 N.E.2d 905 (Ohio Ct. App. 2013).

41, 51, 652 N.E.2d 1006 (Ohio Ct. App. 9th Dist. 1996) (internal quotation marks and citation omitted). The Ohio Supreme Court repeatedly has explained that when probable cause is lacking, an abuse of process claim cannot lie, and the plaintiff must instead proceed under malicious prosecution.

> We hold that the three elements of the tort of abuse of process are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process.

> Even though the tort of malicious prosecution and the tort of abuse of process have different elements, in some situations the same facts which may constitute an abuse of process may also support an action for malicious prosecution. In that case, a complaint could allege both causes of action, in separate counts. In such a situation, a consideration of whether probable cause was present to bring the underlying litigation would be the key to determining under which tort theory the action should proceed.

*Id.* (footnotes omitted, emphasis added)*; see also Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005) (citing *Yaklevich, L.P.A.*, *supra*).

The Ohio courts have further explained that in an abuse of process case,

> "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." Prosser & Keeton on Torts (5 Ed.1984) 898, Section 121. Simply, abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order.

*Robb v. Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9, 14, 75 Ohio St.3d 264, 271 (Ohio 1996). However, there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even if he did so with bad intentions. *Beamer v. NETCO Inc.*, 411 F. Supp.2d 882, 890 (S.D. Ohio 2005).

As explained above, malicious prosecution and abuse of process claims may be

pleaded in the alternative, as Plaintiff did in this case. (Doc. 103 at ¶¶41-42). However, it is noteworthy that Plaintiff's second amended complaint alleges throughout that Defendant Lester's wrongdoing was the making of "**false** and petty police reports about the Plaintiff interfering with his government financed tree cutting business…every time she was observed watching him cut trees down in her Greenhills neighborhood." (Doc. 103 at ¶37, emphasis added). Plaintiff repeatedly alleges that Lester called Village police "to hear his false charge that the Plaintiff was interfering with his tree cutting operations when in fact there was no evidence of interference taking place….," and that his "false charge directly resulted" in Plaintiff's arrest by Moore. (*Id.* at ¶¶ 38-39). She alleges that Lester "*did not have a good faith basis to accuse the Plaintiff of any crime and was motivated by a malicious intent to retaliate…given the Plaintiff had made numerous complaints about his business operations to Village council on prior dates.*" (*Id.* at ¶40, emphasis added). She also alleges that Lester "intimidat[ed] one of his employees to swear out a false police report." (*Id.*). Thus, throughout her complaint, Plaintiff repeatedly emphasizes that Lester had no basis at all (i.e., a lack of probable cause) to contact police or to cause to have her arrested for allegedly interfering with his tree cutting operations. (*See also* Doc. 103 at ¶¶14, 16-17). Only in her final allegation does she throw in a cursory alternative allegation: "In the alternative, Lester has committed an abuse of process in that if his complaint about the Plaintiff is deemed motivated by probable cause it was with an ulterior motive to pervert (change something good into something evil) the justice system to yield a result for which it was not meant, to wit: to use a petty criminal law complaint to protect a publicly financed business from criticism by a tax payer who pays for Lester's tree cutting services." (*Id.* at ¶42).

Plaintiff testified that Lester and his company had obtained a contract with the Village in August 2011, to provide all tree-cutting services to the Village for a period of time that ultimately lasted until 2014.[13] (Doc. 208 at 130-134, 150).

Defendant Lester argues that he is entitled to judgment because, in addition to the allegations of her second amended complaint, Plaintiff's own testimony confirms that she is alleging that probable cause <u>did not</u> exist to initiate her arrest and criminal proceeding. I agree.

Ohio courts have continued to maintain clear distinctions between an abuse of process claim and a malicious prosecution claim.

> Abuse of process differs from malicious prosecution in that abuse of process connotes the use of process <u>properly initiated</u> for improper purposes, while malicious prosecution is the malicious initiation of a lawsuit that one has no reasonable chance of winning. *Robb v. Chagrin Lagoons Yacht Club, Inc.* (1996), 75 Ohio St.3d 264, 271, 662 N.E.2d 9.

*Mansour v. Croushore*, 958 N.E.2d 580, 583, 194 Ohio App.3d 819, 823 at ¶ 12 (Ohio Ct. App. 2011) (emphasis added).

Plaintiff has repeatedly testified that the criminal charges filed against her for disorderly conduct on November 2, 2011 were improper from the outset, and were completely <u>without probable cause or reasonable foundation</u>, motivated solely by the Village and/or its police force working in concert with Defendant Lester:

> Q: Yeah, let's do that. So you believe that even – in the September 1st, 2011 incident, you believe that was motivated by some direct understanding with the Village of Greenhills that that was what they wanted them [Lester] to be doing?
>
> A: Oh, absolutely

---

[13]Plaintiff testified that the initial tree services contract was for a lengthy period. While not entirely clear, Plaintiff's claim appears to have been based upon a theory that Lester's motivation on November 2, 2011 was either to prevent cancellation of the existing contract, and/or to ensure future renewal of that contract.

.

Q: Okay.  And then again on November 2nd?

A:  Absolutely.

Q: And in that instance in particular, you believe the whole thing was a setup in advance?

A: Absolutely.

Q: Okay.  And you believe that both of those instances were totally unfounded?

A: Absolutely.

Q: And there was no –

A:  And the judge – the judge found that also.

Q: There was no basis for them to have any interest in you whatsoever?

A:  Absolutely.

Q:  So if anyone were to say, Hey, listen, this started out – they – they had some basis, they were really looking out for your safety but later on it turned into something else, you wouldn't agree with that?

A:  No.  I don't think anyone in their right mind would.

Q: So you believe it was totally planned and –

A:  Malicious conspiracy.

Q:  Right from the very beginning?

A:  Absolutely.

(Doc. 208 at 185:16- 186:21; *see also id.* at 120-122).   In short, Plaintiff has testified throughout this case that Lester had no basis for contacting police, and that the criminal charges filed against her were initiated without any basis at all.  (Doc. 208 at 182, "[T]he fact that he called the police was just totally unfounded"; *see also* Doc. 210 at 433-434, testifying that Lester made a false witness statement and placed a call to the police that

was false and fraudulent from the outset). She further testified that Lester and his employees did not know "exactly what [Officer] Mr. Moore was going to do, that they really knew that he was going to attack me…." (Doc. 208 at 155; *id.* at 156-157, testifying that Lester was not "pulling the strings," and did not have anything to do with Defendant Moore's use of excessive force, but instead "facilitated the call and allowed the course of events to happen").

Based upon Plaintiff's testimony that denies that the November 2, 2011 charges constituted a legal proceeding that was "set in motion in proper form and with probable cause;" Lester is entitled to judgment as a matter of law. *See Turner v. Lerner, Sampson & Rothfuss*, 776 F.Supp.2d 498, 507-08 (N.D. Ohio 2011) (where plaintiffs' own allegations claimed that defendant law firm lacked probable cause to initiate foreclosure actions, they sought to prove the opposite of an essential element of abuse of process claim); *accord Cox v. Oliver*, 66 N.E.3d 1101, 1104 (Ohio Ct. App. 2016) (where amended complaint alleged that defendant unlawfully pursued criminal prosecution and that second defendant aided and supported that effort, plaintiff's allegation that prosecution was commenced without probable cause negated the availability of an abuse of process claim against either defendant).

Plaintiff's "stopgap response" limits argument in opposition to Defendant Lester's motion for summary judgment to a claim that her malicious prosecution claim should "relate back" to the filing of her original complaint for statute of limitations purposes. She does not point to any specific evidence or make any argument to counter the Defendant's arguments concerning her abuse of process claim, nor does she point to any evidence that would support her allegation that Lester had a financial motive to gain

through the abuse of process that he could not otherwise achieve.  Lester is therefore entitled to summary judgment.

### C.  The Village Defendants' Motion for Summary Judgment

Turning next to Plaintiff's claims against the Village Defendants, the undersigned concludes that those Defendants are also entitled to judgment as a matter of law. Plaintiff's complaint alleges that both the Village and Officer Moore are liable for Moore's use of excessive force in violation of the Fourth Amendment of the U.S. Constitution, and for the deprivation of her rights to be free of unreasonable search and seizure under the Fourth Amendment.

To reiterate, Plaintiff alleges that the Village "ratified" Moore's conduct and "as a matter of business policy or deliberate indifference" did not properly train Moore, or alternatively, has an "official business policy of not supervising Moore." (Doc. 103 at ¶26).  She alleges that the Village and Moore "were…motivated by a malicious intent to physically retaliate against the Plaintiff" based upon her prior First Amendment activity, which was critical of the Village and its police force. (*Id.* at ¶27).  In a separately stated third claim that this Court has allowed only against Moore, Plaintiff alleges that he inflicted "emotional distress requiring medical treatment" upon Plaintiff by "tormenting and mistreating her at public meetings…during and after [the] excessive force arrest…." (Count Three).

### 1.  Officer Moore's Qualified Immunity Claim

Defendant Moore first argues that he is entitled to qualified immunity in his individual capacity for Plaintiff's Fourth Amendment claims.  The undersigned agrees.

The purpose of qualified immunity is to provide governmental officials with the

ability "reasonably to anticipate when their conduct may give rise to liability for damages." *See Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (internal quotation omitted). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his or her actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

When a defendant moves for summary judgment based on qualified immunity, the official must first show that he acted within discretionary authority. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once an official makes this showing, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in that position would have understood it was unreasonable to engage in the conduct that violated the right. *Id.* Here, Plaintiff has made no claim that Defendant was acting outside his authority, so the burden falls on Plaintiff to overcome the qualified immunity defense.

There is no dispute that the Fourth Amendment right of an individual to be free from the excessive use of force during an arrest is clearly established. "A claim of excessive force under the Fourth Amendment requires that a plaintiff demonstrate that a seizure occurred, and that the force used in effecting the seizure was objectively

unreasonable." *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir. 2011).  Construing all disputed facts in Plaintiff's favor, Defendant Moore is entitled to qualified immunity on the claims presented because, using the appropriate standard of objective reasonableness, he did not violate Plaintiff's rights when he employed a modest amount of force during the course of her arrest.

The reasonableness of any particular use of force during an arrest must be judged from the perspective of a reasonable officer on the scene, without the 20/20 vision of hindsight. *Graham v. Conner*, 490 U.S. 386, 388 (1989).  Not every push or shove, even if later seen as unnecessary, will violate the Fourth Amendment, since police officers "are often forced to make split second judgment – in circumstances that are tense, uncertain, and rapidly evolving – concerning the amount of force that is necessary in a particular situation.  *Id.* at 396-397.  In determining whether a use of force was reasonable, courts are instructed to balance three factors:  (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

There is no genuine issue of material fact that when Officer Moore responded to the scene on November 2, 2011, he instructed Plaintiff to move from her position further away from the ongoing tree-cutting operations.  There is also no dispute that Plaintiff understood Officer Moore's instruction to her to leave the vicinity, notwithstanding her testimony that she did not initially hear his precise words due to the noise level of the tree-cutting operations.  Plaintiff's own words (informing the officer that she was "not in

any danger here") and actions, along with the fact that a similar warning had been conveyed by Officer Moore two months earlier, illustrate that she understood the officer's command. Plaintiff refused to comply with the officer's instructions, which she viewed as unreasonable.[14] Instead of complying, she moved a couple of yards away, remaining in an area that Officer Moore attested that he believed still posed a danger to Plaintiff's safety.

Plaintiff admits that she understood the officer had stated his intention to arrest her if she did not fully comply with his instructions. She admits that she began screaming "get your hands off me" when Officer Moore "shoved" her by placing his hands on her chest, in an action that reflected his intention to physically direct Plaintiff after she refused to move, a moment prior to her arrest. She testified that rather than comply, she turned and took one or two steps when she felt Moore's hands on the top of her shoulders bringing her to an immediate stop. Whether Plaintiff's one or two steps were interpreted by Moore to have been flight or continued non-compliance with his instructions, a police officer is entitled to use reasonable force when making an arrest. *Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007) (force reasonable despite fact that very drunk 78 year old man posed little risk to 26 year old 270 pound officer, in part because intoxicated arrestee's unpredictability created volatile situation, and resistance to arrest including refusal to place hands behind his back justified force to complete handcuffing).

The use of physical force that stopped Plaintiff in her tracks was the placement of

---

[14]Whether the officer's instructions were in fact unreasonable is not an issue before this Court, just as the lawfulness of the arrest is not before this Court. Although her original complaint included claims of false arrest and/or of malicious prosecution against Officer Moore, the second amended complaint limits the claims against Moore and the Village to excessive force during her arrest, and to the intentional infliction of emotional distress.

Moore's hands on top of her shoulders, and lasted no more than one or two seconds. She concedes that Moore informed her that she was under arrest a moment after seizing her, while he was trying to handcuff her, in one continuous motion. She testified that she screamed at Moore a moment before she was arrested, and continued screaming, allegedly due to pain from the shoulder injury sustained when Officer Moore lost his grip on her left shoulder and she "sagged," feeling her shoulder "rip." She admits she resisted and did not permit him to complete the action of handcuffing her, that he called for backup while restraining her in place against his cruiser, and that despite the initial force of securing her against the cruiser (which did not cause bruising or any other injury), he loosened his hold while he and she stood motionless for 2-3 minutes awaiting assistance.

Active resistance to arrest includes "physically struggling with, threatening or disobeying officers" and "includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Radlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). Plaintiff's initial refusal to submit to an order that Officer Moore believed was lawful preceded her arrest. Once Officer Moore made the decision to arrest her, she actively resisted the arrest.

The original reason for arrest (disorderly conduct based upon Plaintiff placing herself in danger from the tree-cutting operations, and refusing to retreat to a safe area as directed) is clearly a low-level crime that would not justify any significant use of force.[15] She initially also was charged with resisting arrest but that charge was

---

[15]The basis for the charge is evident from the transcripts of both the May 23, 2013 trial (at which Plaintiff was initially convicted of disorderly conduct) and the September 2013 retrial (at which Plaintiff won acquittal on the same charge). Although the state court transcripts attached as Plaintiff's exhibits are not

dismissed prior to trial. However, regardless of the fact that she was eventually acquitted (on retrial) of disorderly conduct, the evidence at the time suggested that Plaintiff was unwilling to comply with the officer's instructions and would continue to place herself in an area that the officer believed posed a danger. Plaintiff's own testimony corroborates that the officer's actions appeared designed to remove her from a potential place of danger to a place of safety.[16]

Although Officer Moore's age, height and weight are not clear from the record, Plaintiff testified to her belief that he stands more than 6 feet tall. Plaintiff's medical records reflect that at the time of the incident, she was 64 years old, stood 5' 3" in height, and weighed approximately 160 pounds. (Doc. 209 at 292; *see also* Doc. 211-1 at 2-3). It is undisputed that Plaintiff exhibited no intention of complying with Officer Moore's instructions or submitting to arrest. Thus, based on the facts presented, it was objectively reasonable for Officer Moore to employ a modest amount of physical force to effectuate her arrest, thereby forcibly removing her from any danger posed by her proximity to the tree-cutting operations.[17] *See Bolden v. City of Euclid*, 595 Fed. Appx. 464, 471 (6th Cir. 2014). Plaintiff's argument that the amount of force he chose (placing his hands on top of her shoulders to abruptly stop her in her tracks) was objectively unreasonable is not sufficient to overcome the Defendant's qualified immunity defense. Plaintiff testified that the placement of his hands on her shoulders to stop her caused her feet to leave the ground because she was moving,[18] but she also testified that the

_____

authenticated, they have been considered because Defendants do not dispute that they could be presented in an admissible form.

[16]Plaintiff testified that after her arrest while at the Village Police Department, she overheard Moore state to someone on the telephone: "I can't just cite and release. She'll just go back there." (Doc. 209 at 301).

[17]Again, the validity of the arrest itself is not in issue in this case.

[18]Plaintiff's description of the Defendant's placement of his hands only on the top of her shoulders calls into question her report that he was able to physically lift her from the ground in that manner, however

injury occurred in an instant when Officer Moore lost his grip on her left shoulder. In other words, Plaintiff's alleged shoulder injury was not caused by any intentional conduct of Officer Moore. Under the circumstances (a screaming, resisting person who had been warned of her imminent arrest but nevertheless refused to comply with instructions), a reasonable officer could have believed that the modest amount of physical force employed to effectuate the arrest was reasonable and necessary. *See Goodrich v. Everett*, 193 Fed. Appx. 551 (6th Cir. 2006) (holding that a subjective intent to cooperate, in the absence of evidence of communication of that intent and given the totality of circumstances that suggested the opposite intent, is "insufficient to overcome the built-in measure of deference to the officers' on-the-spot judgment about the level of force necessary.").

Additionally, the undersigned finds nothing in the record to support any claim of a violation of Fourth Amendment rights after Plaintiff's seizure by Officer Moore, from the time he secured the initial handcuff on Plaintiff's left wrist, waited with Plaintiff against the cruiser for 2-3 minutes for back-up support to complete the handcuffing, or during her transport to the Greenhills Police Department office and/or Hamilton County Justice Center. Plaintiff testified to her belief that the failure to seatbelt her "when your [police] guidelines call for it" constitutes an excessive use of force under the Fourth Amendment. (Doc. 209 at 312). While the failure to secure Plaintiff's seatbelt may have been negligent, it does not amount to a Fourth Amendment violation.

Plaintiff's lack of proof of any physical injury resulting from the incident also

_____

momentarily. However, the manner of stopping her by placing his hands on top of her shoulders as opposed to tackling her to the ground or through other physical force also emphasizes the relatively minimal nature of the force employed. Considering that Plaintiff had given every intention of declining to comply with his instructions, it is unclear how Moore could have completed her physical arrest without some use of force.

supports the entry of judgment in Moore's favor. To be clear, the Supreme Court has confirmed that the lack of any injury is not the crux of Fourth Amendment analysis, because it is possible to assert a claim for excessive force even if only a *de minimis* injury results. Nevertheless, the absence of injury can support a conclusion that the force used during an arrest was reasonable. *Accord, Bolden v. City of Euclid*, 595 Fed. Appx. at 471. Plaintiff's claim of excessive force rests on the amount of physical force applied during a one to two second period during her arrest, during which she alleges that she sustained a serious injury to her left shoulder. However, Plaintiff testified that she was "not in extreme physical pain other than the date of the incident," and only later experienced pain "periodically, if I made a specific movement" such as reaching up for her seatbelt. (Doc. 210 at 419; *see also* Doc. 209 at 359, confirming pain was erratic with certain movements). She testified that it was only after friends advised her over Christmas that she should get "checked out for rotator cuff" because that could require surgery that she made an appointment with her physician in either January or February of 2012. (Doc. 209 at 355-356). However, Plaintiff has failed to come forward with any record documenting that appointment, or with any other evidence that would corroborate her claim of more than *de minimis* injury sustained on November 2, 2011.

Officer Moore's contemporaneous report reflects Plaintiff's report of "arm and wrist aching" but no other injury. Plaintiff did not seek medical treatment after being released the same day, (*id.* at 335), and medical intake records from the justice center reflect no complaints or report of injury at all. A medical record dated November 18, 2011 as a routine three-month follow-up appointment reflects no reported concerns relating to her shoulder. (Doc. 211-1 at 1). A record dated December 30, 2011 likewise

reports no "new medical problems." (Doc. 211-1 at 25). Plaintiff also failed to report any arm or shoulder pain at a follow-up medical appointment in February 2012. (Doc. 210 at 412).

During her deposition Plaintiff admitted that she had been diagnosed with left shoulder impingement in April of 2007, four and a half years prior to the incident. (Doc. 209 at 349-350; Doc. 211-1 at 2). The first post-incident record in which Plaintiff reported shoulder pain to a physician is dated nearly a year and a half <u>after</u> the incident, on April 29, 2013, but the physician's note reads "suspect recurrent flair of rotator cuff tendonitis <u>with yard work</u>." (Doc. 211-1 at 6-7; Doc. 209 at 365, emphasis added). The physician's note refers to a prior incident of shoulder pain on an unstated date that "[r]esolved for a few months after course of steroids." (Doc. 211-1 at 6). Plaintiff's explanation that her physician failed to reference the cause of her injury as dating from her November 2011 arrest because it was "continuing treatment," (Doc. 209 at 365), is not credible in the absence of any evidentiary support. Although Plaintiff continually argues that more definitive medical records linking the injury to her arrest were "missing" from the production of records initially provided to Defendants by University Hospital and were later hand-delivered by her to defense counsel, it remains *Plaintiff's* burden to produce probative evidence in response to the Defendant's motion for summary judgment. Failing to carry that burden, Plaintiff has produced no evidence of any injury that relates to her arrest.

### 2. Plaintiff's Claims Against the Village Fail As a Matter of Law

Because Officer Moore did not violate Plaintiff's Fourth Amendment rights during the arrest, the Village cannot be held liable on Plaintiff's claims that it "ratified" his

allegedly unconstitutional conduct, and/or that it had a policy of failing to train its officers on the use of force in violation of the Fourth Amendment. Therefore, the Village is entitled to summary judgment.

However, should any reviewing court disagree and find that Plaintiff has produced evidence sufficient to overcome Defendant Moore's motion for summary judgment, the undersigned still would recommend that the Village be granted summary judgment. On the record presented, the evidence supports no more than a theory of "supervisory" liability, and a municipality cannot be held liable under 42 U.S.C. § 1983 under a theory of respondeat superior. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

The Village persuasively argues that Plaintiff has failed to come forward with any evidence that the Village has promulgated any official policy or custom that resulted in the alleged deprivation of her constitutional rights. *See Gregory v. City of Louisivlle*, 444 F.3d 725, 752 (6th Cir. 2006). To carry her burden, Plaintiff is required not only to show the existence of a policy or custom, but she is required to show that the policy or custom was a "moving force" behind the constitutional violation. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). Where the cited policy is not itself unconstitutional, the plaintiff must show more than a single incident to establish fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation. *Mann v. Helmig*, 289 Fed. Appx. 845, 852 (6th Cir. 2008), citing *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).

A municipality may be held liable for a deficiency in a training program "only where the failure to train amounts to deliberate indifference to rights of persons with

whom the police come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). To prove her claim, Plaintiff must show that "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

> That a particular officer may have been unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program….Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training…plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

*Id.* at 390-391 (internal citations omitted). On the facts presented, the Village would be liable only if Plaintiff's evidence suggests such a complete failure to train, or training that is so reckless or grossly negligent, that future police misconduct is almost inevitable. *Hays v. Jefferson County, Ky*, 668 F.2d 869, 874 (6th Cir. 1982).

The Village has filed the affidavit of its current Chief of Police who attests that all Village officers attend a six month basic training course at the Ohio Peace Officer Training Academy, and thereafter participate in a field training program consisting of several weeks of practical skills training under the supervision of experienced field training officers. (Doc. 200-1). Officers also are provided continuing education courses and are trained specifically on use-of-force bi-annually. *Id.* Plaintiff testified that she is unaware of any deficiencies in the training that the Village provides to its officers. (Doc. 209 at 332).

In opposition to Defendant's motion, Plaintiff argues that the current Chief of Police was hired after 2011, and therefore cannot attest to what the use of force policy

was, or what training was received by the police force on or before November 2, 2011. However, the undersigned finds this argument to be without merit.  Despite the lack of precise dates offered by Chief Ferdelman's affidavit, the affidavit is sufficient, together with the attached Village Use of Force policy (which is dated in 2008, well before the 2011 incident) to support the Defendant's contention that no dispute exists concerning the training provided to Village officers, including Officer Moore.   The only contrary evidence that Plaintiff points to is a discovery response dated 9/24/15 in which Officer Moore states that he does not currently have a copy of his "police training documentation regarding use of force continuum" in his possession, custody, or control. (Doc. 213-1 at 61-62, Request for Production IV and response). However, the fact that in September 2015, Officer Moore did not possess documentation of his training from four years earlier, is not sufficient to create a genuine issue of fact about whether the Village trains its officers on use of force.

        Plaintiff's allegation that the Village "ratified" Officer Moore's alleged violations of the Fourth Amendment also fails as a matter of law.   Plaintiff made no complaint about Defendant Moore's conduct to the police chief at the time, because she believed it would be futile.  (Doc. 209 at 332).  To prevail under an "inaction theory," Plaintiff must provide: (1) a clear and persistent pattern of illegal activity, (2) which the Village knew or should have known about; (3) yet remained deliberately indifferent about and (4) that the Department's custom was the cause of the violation. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-433 (6th Cir. 2005).  Plaintiff has offered no evidence whatsoever to prove these elements.   In response to Defendant's motion, she must offer at least minimal evidence of some pattern of illegal use-of-force activity.  Plaintiff's

apparently long-running political disputes with the Village may (in her view) show animus by Village officials (particularly by the mayor and Council officials), but she has failed to present any evidence that the Village "ratified" any alleged Fourth Amendment violation by Officer Moore.

### 3. Plaintiff's Emotional Distress Claims Against Officer Moore Fail as a Matter of Law

Last but not least, Defendant Moore is entitled to judgment as a matter of law on Plaintiff's intentional infliction of serious emotional distress claims. As an employee of a political subdivision acting within the scope of his duties as a police officer, Officer Moore is entitled to the protections of Ohio Revised Code § 2744.03(A)(6) unless his actions were "manifestly outside the scope" of his employment as a police officer, or his actions "were with a malicious purpose, in bad faith, or in a wanton or reckless manner." There is no liability for negligence. *See Linley v. DeMoss*, 615 N.E.2d 631, 634, 83 Ohio App.3d 594, 599 (Ohio Ct. App. 1992). Even if Officer Moore made a mistake in arresting Plaintiff, that mistake would not give rise to civil liability under Ohio law.

Ohio courts have held that the absence of wanton misconduct and issues of immunity can be determined as a matter of law, "preferably on a motion for summary judgment." *Id.*, 615 N.E.2d at 634 (internal quotation and citation omitted). Ohio differentiates between "willful," "wanton" and "reckless" misconduct. *Anderson v. Massillion*, 983 N.E.2d 266, 134 Ohio St. 3d 380 (Ohio 2012). "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id* at ¶32. "Wanton misconduct is the failure to exercise any care toward those to whom

a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at ¶33. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34.

Summary judgment is appropriate when there is no evidence that the employee acted wantonly or recklessly. *See Irving v. Austin*, 741 N.E.2d 931, 934, 138 Ohio App.3d 552, 556 (Ohio Ct. App. 2000). On the facts presented and for the same reasons that Officer Moore is entitled to qualified immunity on the Fourth Amendment claims, he is immune from Plaintiff's Intentional Infliction of Emotional Distress claim under Ohio law. There is no evidence that the Defendant acted unreasonably, much less wantonly, willfully or even recklessly.

Even if the Ohio statute did not shield Officer Moore, however, the undersigned agrees with Defendant's alternative argument that he is entitled to judgment based upon the lack of proof on this claim. Under Ohio law, the tort of intentional infliction of serious emotional distress is committed when a person "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another…." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehouseman & Helpers of Merica*, 453 N.E.2d 666, 671, 6 Ohio St.3d 369, 374 (Ohio 1983) (quoting Restatement (Second) of Torts, (1965) 71, Section 46(1), vacated on other grounds by *Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007)). Plaintiff has failed to produce evidence to establish any of the elements of her claim. *See generally Cook v. Cincinnati*, 658 N.E.2d 814, 103 Ohio App.3d 80 (Ohio Ct. App. 1995) (granting summary judgment where plaintiff failed to show officers' conduct was malicious, wanton, reckless or in bad faith)*; see also Knox v.*

*Hetrick*, 2009 WL 792357 (Ohio Ct.. App March 26, 2009) (arrestee could not recover based on lack of evidence that officer intended to inflict emotional distress or that his conduct in effecting arrest amounted to the type of extreme and outrageous conduct necessary to support a claim).

### III.　　Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** Defendants' motions for summary judgment on all claims (Docs. 199, 200) be **GRANTED,** and that this case be dismissed.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

PATRICIA A. ANDWAN,                                        Case No. 1:13-cv-624
              Plaintiff,

                                                          Beckwith, J.
                                                          Bowman, M.J.

        v.


VILLAGE OF GREENHILLS, et al.,

              Defendants.


**NOTICE**

        Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).